RECORD NO. 13-1932

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

MICHELIN NORTH AMERICA, INC.,

*Plaintiff-Appellee,*

Michelin Retread Technologies, Inc.
*Plaintiff*

v.

INTER CITY TIRE AND AUTO CENTER, INC.,

*Defendant-Appellant.*

Inter City Retread, Inc.
*Defendant*

_____

**OPENING BRIEF OF DEFENDANT-APPELLANT**
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA AT GREENVILLE

William Alexander Coates
ROE, CASSIDY, COATES & PRICE, PA
1052 N. Church Street
Greenville, South Carolina 29603-0000
(864) 349-2600 (Telephone)
wac@roecassidy.com

Counsel for Defendant-Appellant

Michael J. Connolly
HINCKLEY, ALLEN & SNYDER, LLP
28 State Street
Boston, Massachusetts 02109-1775
(617) 345-9000 (Telephone)
mcconnolly@hinckleyallen.com

Counsel for Defendant-Appellant

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26 and Local Rule 26.1, Counterclaim Plaintiff/Appellant Inter City Tire and Auto Center, Inc. states that it is not a publicly held corporation; it does not have any parent corporations; and it has no stock owned by a publicly held corporation or other publicly held entity. Upon information and belief, Counterclaim Defendant/Appellee Michelin North America, Inc. is a publicly held corporation.

<u>/s/William A. Coates</u>

# **TABLE OF CONTENTS**

**Page**

JURISDICTIONAL STATEMENT ........................................................... 1

QUESTIONS PRESENTED ..................................................................... 1

STATEMENT OF THE CASE ................................................................. 2

STATEMENT OF FACTS ....................................................................... 6

    A. Inter City ................................................................................. 6
    B. Dealer Agreements .................................................................. 7
    C. Retread Tire Franchise Business ............................................. 9
    D. Inter City's Discovery of Corruption Scheme ......................... 10
    E. Michelin's Race to the Courthouse .......................................... 12
    F. Michelin's Purported Termination of ICT .............................. 12
    G. The Instant Litigation .............................................................. 15
    H. The New Jersey Case .............................................................. 16
    I. The Request for an Evidentiary Hearing ................................. 18

SUMMARY OF ARGUMENT ................................................................ 20

STANDARD OF REVIEW ..................................................................... 25

ARGUMENT .......................................................................................... 26

I.    The District Court Erred In Finding, At The Preliminary Injunction
    Stage, That The Choice of Law Provisions In The Dealer Agreements
    Should Be Upheld ............................................................................ 26

    A. Enforcement of the Choice of Law Provisions in the Dealer
       Agreements Would Violate South Carolina Public Policy under
       the Circumstances of the Case ................................................. 26
    B. The District Court Erred in Failing to Apply Section 187 of the
       Restatement (Second) of Conflict of Laws .............................. 39
    C. The District Court Erred in Finding that Federal Common Law
       Does Not Govern Choice of Law Determinations Concerning
       Supplemental State Law Claims Where Jurisdiction Is Premised
       on a Federal Question ............................................................... 41

D. The Choice of Law Provisions in the Dealer Agreements Are Unenforceable Because They Were Executed Under Duress ............................................ 42

II.    The District Court Erred In Failing To Grant ICT Request For An Evidentiary Hearing .......................................................................... 44

III.   The District Court Erred In Finding That ICT Has Not Suffered Irreparable Harm ................................................................................... 48

CONCLUSION ................................................................................................ 52

STATEMENT WHY ORAL ARGUMENT SHOULD BE HEARD .................... 53

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7) ................................ 54

CERTIFICATE OF SERVICE ............................................................................ 55

# TABLE OF AUTHORITIES

**CASES**                                                          **PAGE**

*Aetna Cas.& Sur. Co. v. Quarles*, 92 F.2d 321 (4th Cir. 1937)................... 21, 28, 32

*All Care Nursing Serv., Inc. v. Bethesda Mem. Hosp., Inc.* 887 F.2d 1535 (11th Cir. 1989) .................................................................................................... 47

*AmSouth Bank v. Dale, Inc.,* 386 F.3d 763 (6th Cir. 2006)..................................... 28

*Associated Spring Corp. v. Wilson*, 410 F. Supp. 967 (D.S.C. (1976)............. 31, 40

*Atl. City Coin & Slot Serv. Co. v. IGT*, 14 F. Supp. 2d 644 (D.N. J. 1998) ........... 49

*Belowitz v. General Motors Corp.*, 233 F. Supp. 2d 631 (D.N.J. 2002) ................ 48

*Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977)......... 26

*Canal Ins. Co. v. Ranger Ins. Co.*, 489 F. Supp. 452 (D.S.C. 1986)...................... 40

*Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 421 F. Supp. 233 (D.N.J 1988)... 48

*Centennial Life Ins. v. Poston*, 88 F.3d 255 (4th Cir. 1996).................................... 28

*Chuidian v. Philippine Nat'l Bank*, 976 F.2d 561 (9th Cir. 1992) ......................... 42

*Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549 (S.D.N.Y. 2000) ............. 28

*Cooper Distrib. Co., Inc. v. Amana Refrigeration, Inc.*, 63 F.3d 262 (3d Cir. 1995).................................................................................................... 35

*Detroit Edison Company v. Pacific Insurance Co.*, 742 F. Supp. 287 (M.D. N.C. 1990) ....................................................................................................... 41

*Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802 (4th Cir. 1991). 26

*Dunkin' Donuts Franchised Restaurants LLC v. Strategic Venture Group, Inc.*, No. 07-1923, 2010 U.S. Dist. LEXIS 119417, (D.N.J. Nov. 10, 2010) ........................................................................... 35

*Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.*,100 N. J. 166, 495 A.2d 66 (1985) ................................................................................. 36

*Edelmann v. Chase Manhattan Bank, N.A.*, 861 F.2d 1291 (1st Cir. 1998)............ 42

*Emergency Accessories & Installation, Inc. v. Uhelen Eng'g…Co.*, 2009 U.S. Dist. LEXIS 46959 (D.N. J. June 3, 2009 ................................. 35, 36, 49

*Firestone Financial Corp. v. Owens*, 309 S.C. 73, 419 S.E. 2d 830 (S.C. Ct. App. 1992) ................................................................................ 31

*Gen. Motors Corp. v. New A.C. Chevrolet*, 91 F. Supp. 2d 733 (D.N.J. 2000)........................................................................................... 37

*Glaesner v. Beck*, 791 F.2d 384 (4th Cir. 1986) ....................................... 38

*Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236 (5th Cir. 2009).......................................................................... 42

*Hawkspere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225 (4th Cir. 2003) .............. 35

*Instructional Systems v. Computer Curriculum Corp.*, 130 N.J. 324 (1992) .................................................................................... 33, 34, 35

*ITCO Corp. v. Michelin Tire Corp. Commerical Div.*, 722 F.2d 42 (4th Cir. 1983)............................................................................. 42

*Kaepa, Inc., v. Achilles Corp.*, 76 F.3d 624 (5th Cir. 1996)................................... 47

*Learning Network, Inc. v. Discovery Commerce*, 11 Fed. Appx. 297 (4th Cir. 2001).................................................................................. 27

*Maintainco, Inc. v. Mitsubishi Caterpillar Forklift Am., Inc.*, 975 A.2d 510 (N.J. Super. 2009) ........................................................... 36

*Menezes v. WL Ross & Co.*, 744 S.E.2d 178 (S.C. 2013)........................................ 39

*Mitchell v. Mitchell*, 266 S.C. 196 (S.C. 1996).......................................... 40

*Myles Lumber Co. v. CAN Financial Corp.*, 233 F.3d 821
(4th Cir. 2000)........................................................................................ 28

*Nash v. Tindall Corp.*, 375 S.C. 36, 42 (2007) .................................... 21, 27

*Nautilus Ins. Co. v. Winchester Homes, Inc.*, 15 F.3d 371
(4th Cir. 1994)........................................................................................ 28

*Needbasedapps, LLC v. Robbins*, 2013 U.S. Dist. LEXIS 24187
(W.D. Tex. 2013) .................................................................................... 32

*Nienow v. Nienow*, 268 S.C. 161 (1977).............................................. 40

*Nucor Corp. v. Bell*, 482 F. Supp. 2d 714 (D.S.C. 2007) ........................ 27

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013) ....................................... 25

*Perry v. Judd*, 471 Fed.Appx. 219 (4th Cir. 2012)................................. 25

*Phillips v. Baker*, 284 S.C. 134 (1985) ................................................. 44

*Red Roof Franchising LLC v. Patel*, 877 F. Supp. 2d 124
(D.N.J. 2012)......................................................................................... 35

*Russell v. Wachovia Bank, N.A.*, 353 S.C. 208 (2003) ........................... 40

*S.C. Dept of Parks v. Brookgreen Gardens*, 309 S.C. 388 (1992) ........ 40

*Santee Portland Cement Corp. v. Mid-State Redi-Mix Concrete Co.*,
273 S.C. 784 (1979) ............................................................................... 44

*Semmes Motors, Inc. v. Ford Motor Corp.*, 429 F.2d 1197 (2nd Cir. 1976) ........... 49

*Scott v. Guardsmark Security*, 874 F. Supp. 117 (D.S.C. 1995) ............ 40

*Simmons v. Gen. Motors Corp.*, 435 A.2d 1167 (N.J. Super. 1981) ...... 36

*Southern States Cooperative, Inc. v. Global AG Associates, Inc.*, No.
06-1494 2008 WL 834389 (E.D. Pa. Mar. 27, 2008) ............................................. 33

*S.States Coop., Inc. v. Global AG Assoc., Inc.*, No. 06-1494,
2008 WL 834839 (E.D. Pa. Mar. 27, 2008) ............................................................. 35

*Standard Register Co., v. Kerrigan*, 238 S.C. 54 (1961) .......................................... 27

*Stonhard, Inc. v. Carolina Floor Specialists, Inc.*, 366 S.C. 156  (2005) ............. 27

*TeamIA, Inc. v. Lucas*, 717 S.E.2d 103 (S.C. 2011) ................................................. 39

*Volvo Construction Equipment North America v. CLM Equipment
Company*, 386 F.3d 581 (4th Cir. 2004) ............................................................ 32, 42

*Warner Chilcot Labs Ireland Ltd. V. Mylan Pharms, Inc.*, 451 Fed Appx.
935 (Fed. Cir. 2011) .............................................................................................. 47, 51

*Westfield Ctr. Serv., Inc. v. Cities Serv. Oil Co.*, 432 A.2d 48 (N.J. 1981) ............ 37

*Winer Motors, Inc. v. Jaguar Rover Triumph, Inc.*, 506 A.2d 817
(N.J. Super. Ct. App. Div. 1986) .............................................................................. 35

## STATUTES

15 U.S.C. § 1 ....................................................................................................... 3, 15
15 U.S.C. § 13 ................................................................................................ 3, 26, 31
18 U.S.C § 1961 ............................................................................................. 3, 15, 26
28 U.S.C. §1292(a)(1) ................................................................................................... 1
N.J.S.A. 56:10-1 ............................................................................................... *Passim*
N.J.S.A. 56:10-2 ......................................................................................................... 34
N.J.S.A. 56:10-3 .................................................................................................. 45, 46
N.J.S.A. 56:10-4 ......................................................................................................... 46
N.J.S.A. 56:10-5 .................................................................................................. 36, 37

## OTHER

Restatement (Second) of Conflict of Laws § 187 .......................................... *Passim*
Restatement (Second) of Conflict of Laws § 188 ...................................................... 33

## JURISDICTIONAL STATEMENT

This is an appeal of an Opinion and Order of the United States District Court for the District of South Carolina at Greenville, dated June 24, 2013 (the "Opinion and Order"), which denied Counterclaim Plaintiff/Appellant Inter City Tire and Auto Center, Inc.'s Motion for a Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65 and Request for an Evidentiary Hearing. This Court has appellate jurisdiction over the Opinion and Order because the Opinion and Order denies a request for a preliminary injunction, which constitutes an interlocutory order that is appealable as of right pursuant to 28 U.S.C. § 1292(a)(1). Inter City Tire and Auto Center, Inc. timely filed this appeal on July 24, 2013, within thirty days following the entry of the Opinion and Order.

## QUESTIONS PRESENTED

1.    Whether the District Court erred in finding, at the preliminary injunction stage, that South Carolina choice-of-law provisions contained in certain dealer agreements between the parties should be upheld and that the New Jersey Franchise Practices Act does not apply to those agreements given their choice-of-law provisions.

2.    Whether the District Court erred in denying Inter City Tire and Auto Center, Inc.'s request for an evidentiary hearing on its Motion for Preliminary Injunction.

1

3.      Whether the District Court erred in determining that Inter City Tire and Auto Center, Inc. failed to meet its burden of proof that it would suffer irreparable harm absent the issuance of the requested injunctive relief.

## STATEMENT OF THE CASE

Since in or around 2000, Counterclaim Defendant/Appellee Michelin North America, Inc. ("MNA"), a tire manufacturer, and Counterclaim Plaintiff/Appellant Inter City Tire and Auto Center, Inc. ("ICT"), a New-Jersey based tire dealer, have conducted business pursuant to various dealer agreements.  In or around 2011, ICT uncovered an illicit corruption scheme involving MNA sales executives who, in collusion with a direct competitor of ICT, and others, used shell corporations to divert deeply discounted tires, intended for large fleet customers, in order to resell those tires to ICT's competitors, which caused ICT to sustain substantial damages. In late 2011, ICT, acting through counsel, disclosed evidence of this scheme to MNA's General Counsel's Office.  After conducting its own internal investigation, MNA terminated two employees involved in the scheme.  Given the publicity that would in all likelihood be associated with the nature of the claims, ICT first tried to negotiate a settlement with MNA privately.  During a March 2013 settlement meeting, ICT's counsel provided MNA's counsel with a draft copy of a complaint that ICT intended to file in the United States District Court for the District of New Jersey, but agreed to refrain from filing while settlement discussions continued.

2

The draft complaint presented claims for violations of, *inter alia*, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and the Robinson-Patman Act, 15 U.S.C. § 13.

On Friday, April 19, 2013, just one minute before informing ICT's counsel that it was not interested in further settlement discussions, and without ever suggesting to ICT that it had any affirmative claims to assert, MNA filed an eight-page, three-count declaratory judgment complaint against ICT, thereby commencing this case. MNA's commencement of this lawsuit was a strategic maneuver designed to beat ICT to the courthouse just before settlement discussions concluded in order to secure venue in South Carolina, where Michelin is headquartered, and avoid the potential application of the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1, *et seq.* (the "NJFPA"). Count I of MNA's Complaint sought a declaratory judgment under the Federal Declaratory Judgment Act that MNA is "not liable" for violations of the Civil RICO Statute, 18 U.S.C. § 1961, *et seq.*, the Sherman Anti-Trust Act, 15 U.S.C. § 1, *et seq.,* and/or the Robinson-Patman Act, 15 U.S.C. § 13. In other words, this count sought a declaration of "non-liability" for some of the very same causes of action asserted in the draft complaint that ICT gave MNA approximately one month earlier. Also on April 19, 2013, MNA mailed ICT a notice purporting to terminate one of the parties' dealer agreements, effective 30 days from ICT's receipt of the letter. This

3

termination notice is the subject of Counts II and III of MNA's complaint, which present supplemental state law claims for declaratory judgment regarding MNA's purported termination of that dealer agreement and for breach of contract under that same agreement, respectively. Three days later, on April 22, 2013, MNA mailed ICT two additional notices of termination of two other dealer agreements between the parties, which also purported to take effect 30 days after ICT's receipt of the notices.

Unaware that MNA had commenced this case, ICT proceeded to file its complaint against MNA in the District of New Jersey on Tuesday, April 23, 2013 (the "New Jersey Action"). On May 1, 2013, ICT filed a First Amended Complaint in the New Jersey Action, requesting, *inter alia*, a declaration that MNA's purported terminations of the dealer agreements between the parties violated the NJFPA. ICT also sought injunctive relief, restraining and enjoining MNA from terminating the dealer agreements, and filed a motion seeking such injunctive relief on that same date.

Just one day before ICT amended its complaint in New Jersey, MNA and its affiliate, Michelin Retread Technologies, Inc. ("MRT") (collectively, "Michelin") filed a First Amended Complaint in the District Court in this action, asserting additional declaratory judgment counts relative to MNA's purported terminations of the other dealer agreements between the parties, among other claims.

4

On Friday, May 17, 2013, the District of New Jersey issued an Order on ICT's application for a preliminary injunction in the New Jersey Action, which stayed the case to allow the Honorable Henry M. Herlong, Jr., of the District of South Carolina to determine whether the District of New Jersey or the District of South Carolina is the proper forum for this action, and administratively terminated ICT's application for a preliminary injunction.  The District of New Jersey also directed ICT, to the extent that it intended to seek injunctive relief to preserve the status quo, to make such application to Judge Herlong in the South Carolina Action.

Accordingly, on Monday, May 20, 2013, which was the first business day following the District of New Jersey's ruling, ICT filed an Answer to MNA's Complaint and, further, asserted a Counterclaim, seeking a declaration that the dealer agreements constitute franchise agreements within the meaning of and subject to the protections of the NJFPA and that MNA's purported terminations of the parties' dealer agreements violated the NJFPA.  ICT's Counterclaim also sought preliminary and permanent injunctive relief, restraining and enjoining MNA's termination of the dealer agreements.   Also on May 20, 2013, ICT filed a Motion for Temporary Restraining Order and Preliminary Injunction, seeking injunctive relief restraining and enjoining MNA's purported terminations of the dealer agreements.

5

On May 22, 2013, the District Court heard oral argument on ICT's request for a temporary restraining order and denied that request. On June 3, 2013, ICT filed a motion requesting an evidentiary hearing on its request for a preliminary injunction. On June 24, 2013, the District Court issued an Opinion and Order, in which it denied the preliminary injunction request, including ICT's request for an evidentiary hearing on the same. ICT thereafter timely filed the instant appeal from the Opinion and Order, within thirty days of its issuance.

## STATEMENT OF FACTS

### A.    Inter City

Since 1980, ICT has been engaged in the business of selling and servicing motor vehicle tires and conducting a full-service truck repair operation. (JA0722) ICT is headquartered in Elizabeth, New Jersey, and operates satellite facilities throughout the New York metropolitan area. (JA0722-JA0723) Until late May 2013, ICT was an authorized dealer of Michelin motor vehicle tires. (JA0721; JA0748-JA0749) ICT's corporate affiliate, Defendant Inter City Retread, Inc. ("ICR"), operates a Michelin Retread Technologies truck tire retreading facility. (JA0722) ICT and ICR shall be referenced, collectively, as "Inter City." For years, Inter City has successfully promoted, sold and serviced Michelin brand tires and has developed a loyal customer base as well as an excellent reputation among its customers for high quality service and fair prices. (JA0721-JA0722)

6

## B.    The Dealer Agreements

Prior to late May 2013, ICT sold and serviced Michelin new truck tires and earthmover tires, and conducted a full-service truck repair operation, pursuant to various commercial dealer agreements with Michelin.  One such agreement was a 2010 Commercial Customer Agreement (the "2010 Commercial Customer Agreement"), which designated ICT as an authorized, non-exclusive retailer of Michelin brand products, including Michelin new truck and earthmover tires, and set forth the terms of ICT's promotion, marketing, selling and servicing of those tires within the United States.  (JA0726-JA0727; JA0756-JA0779)  The 2010 Commercial Customer Agreement granted ICT the right to use Michelin's trademarks, logos, domain names, metatags and trade names for the purpose of advertising and promoting the sale and use of Michelin products.  (JA0759) Among other things, the Commercial Customer Agreement required ICT to vigorously and aggressively promote the retail sale of Michelin products, ensure that each of its locations was at all times adequately staffed with suitably trained personnel and equipped with the tools and machines necessary to service Michelin products, honor and efficiently service any manufacturers' warranties relating to Michelin products, and maintain an adequate inventory of Michelin products at all

times.[1]  Since the inception of this dealer arrangement, ICT fulfilled its obligations

under the Commercial Customer Agreement and predecessor contracts.  (JA0727)

Since in or around 1980 and until late May 2013, ICT was also an authorized

dealer of Michelin passenger tires, or small tires, pursuant to various Michelin

Americas Small Tires (MAST) retail agreements, the most recent of which is a

2013 MAST Authorized Retail Agreement (the "Passenger Tire Agreement").

(JA0727; JA0936-JA0962)  Like the Commercial Customer Agreement, the

Passenger Tire Agreement granted ICT the right to use Michelin brand trademarks,

logos, domain names, metatags and trade names for the purpose of advertising and

promoting the sale and use of MAST products.  (JA0946)  The Passenger Tire

Agreement also required ICT to vigorously and aggressively promote the sale of

MAST products, to ensure that each of its locations was at all times adequately

staffed with suitably trained personnel and equipped with the tools and machines

necessary to service MAST products, display MAST-approved point of promotion

material, maintain an adequate inventory of MAST products at all times, and honor

and efficiently service any manufacturers' warranties relating to MAST products,

among other things.  (JA0942-JA0943)  Since the inception of this dealer

---

[1] The parties also executed another Commercial Customer Agreement dated
September 9, 2009, which has identical provisions to the Commercial Customer
Agreement.  (JA0757)  This agreement shall be referenced collectively with the
Commercial Customer Agreement as the "Commercial Customer Agreement," or
individually as the "September 9, 2009 Commercial Customer Agreement."

arrangement, ICT fulfilled its obligations under the Passenger Tire Agreement and successor contracts. (JA0727) The Commercial Customer Agreement and the Passenger Tire Agreement shall be referenced, collectively, as the "Dealer Agreements." All of the Dealer Agreements contain provisions stating that the "[c]ustomer consents to the personal jurisdiction and venue of the federal and state courts in Greenville County, South Carolina, for any court action or proceeding." (JA0078; JA0105; JA0138). The Dealer Agreements also contain South Carolina choice-of-law provisions. (Id.)

### C.    Retread Tire Franchise Business

Since in or around 2000, Inter City, by and through Defendant ICR, has also operated a Michelin franchised tire retreading plant engaged in the exclusive manufacture of Michelin brand retreads, pursuant to various retread franchise agreements with MRT. (JA0728) The most recent franchise agreement executed by MRT and ICR is a Michelin Retread Technologies, Inc. Franchise Agreement dated November 1, 2005 (the "Retread Franchise Agreement"). (JA0728; JA0782-JA0850) ICR sells the retreaded tires it produces to ICT for re-sale to the retail customers of ICT. (JA0722) Before ICT was terminated, ICT also sold the retreaded tires to national account fleets for which Michelin reimbursed ICT. (Id.)

Michelin required ICR to invest substantially more than $1,000,000 in equipment and production facilities in order to become a Michelin MRT

9

franchisee. (Id.) The single greatest inducement for Inter City to enter into the Retread Franchise Agreement and to make the $1,000,000-plus investment in the business was Michelin's representation -- and Inter City's understanding -- that ICT would continue to be a Michelin new tire dealer. (Id.) In fact, when Michelin offered the franchise to ICT, Michelin representatives told ICT principal Neil Erbesh that one of Michelin's requirements for the granting of an MRT franchise was that the franchisee also be a Michelin new tire dealer - - a requirement that ICT satisfied. (JA0722-JA0723)

ICR has played a critical role in Michelin's "cradle to grave concept," which is the cornerstone of Michelin's strategy in the retread business. This "cradle to grave concept" envisions customers meeting all of their needs for new tires and retreads from one dealer -- a dealer who necessarily serves as both a Michelin new tire dealer and an MRT franchisee. (JA1285) It is the very essence of this cradle to grave concept that customers buy the same brand of new tires and retreads from a single dealer, which Inter City has accomplished through ICT and ICR. (Id.)

## D.    Inter City's Discovery of Corruption Scheme

In or around 2011, Inter City uncovered an illicit corruption scheme involving MNA sales executives, who, in collusion with Service Tire Truck Centers, Inc. ("STTC"), a direct competitor of Inter City, and others, used shell corporations to divert deeply discounted tires, intended for large fleet customers,

10

and resell those tires in direct competition with Inter City. (JA0730-JA0746)
Among the goals of the scheme was to economically harm Inter City and drive it
out of business, and it was implemented by, among others, Michelin sales
executives while they were on Michelin's payroll and responsible for supporting
Inter City. (Id.)

In late 2011, Inter City, acting through counsel, disclosed documentary
evidence of the alleged corruption scheme to representatives of Michelin's General
Counsel's office. (JA0329; JA0747) Michelin's in-house counsel advised that it
intended to conduct an internal investigation into the evidence and, within two
months of ICT's disclosure of the evidence, terminated two of the sales executives
who are at the heart of the corruption scheme. (JA0329) Upon information and
belief, Michelin has disciplined several other employees and terminated a New
York City area dealer since then as a result of what it learned in the course of its
internal investigation. (JA0747)

In late 2012, in light of the inflammatory nature of the allegations in this
case, counsel for Inter City reached out to Michelin in an effort to achieve a
settlement, in a confidential setting, of the damages it had sustained as a result of
the illicit corruption scheme. (JA0330) At a settlement meeting held on March 19,
2013, ICT's counsel provided Michelin's in-house counsel and outside counsel
with a draft copy of a complaint it had drafted for filing in the United States

11

District Court for the District of New Jersey, which is where ICT is located and where the illicit corruption scheme, which is the subject of allegations in the draft complaint, primarily took place. (JA0330; JA0374-JA0425) At the same meeting, Inter City's counsel proposed that the parties enter into a tolling agreement while settlement discussions were ongoing, in return for which ICT would refrain from filing the complaint. (JA0330) ICT's counsel made it clear that its patience in refraining from filing suit was conditioned on the execution of the tolling agreement. (Id.) After the meeting, Michelin signed the proposed tolling agreement.

### E.     Michelin's Race to the Courthouse

During the month following the March 19, 2013 meeting, ICT worked with its outside accountants in an effort to complete a formal damages analysis in order to make a concrete settlement demand to Michelin, but ultimately determined that it had insufficient information to complete a reliable analysis. (Id.) Accordingly, ICT's counsel made a request for pre-litigation discovery to Michelin. (Id.) Through e-mails sent at 4:12pm and at 4:21pm on the afternoon of April 19, 2013, Michelin's counsel notified Inter City's counsel that Michelin would not agree to provide the requested pre-litigation discovery and, further, that Michelin did not intend to make a settlement proposal. (JA0330-JA0331; JA0427) Unbeknownst to ICT, just one minute before sending its first e-mail to Inter City's counsel late that

12

afternoon, Michelin's counsel had filed the instant lawsuit in the District Court. (JA0331)  In his late afternoon e-mails, Michelin's counsel mentioned nothing about the lawsuit Michelin had just filed.  (JA0330-JA0331; JA0427)

### F.    Michelin's Purported Termination of ICT

Also on April 19, 2013, Michelin issued a Notice of Termination to ICT from Michelin's Truck Tires Division (the "Truck Tire Termination Notice"), stating that Michelin was exercising its right to terminate ICT, effective 30 days from ICT's receipt of the letter, under Sections 6 and 28 of the 2009 Commercial Customer Agreement.  (JA0748; JA0964)  Michelin's counsel did not mention this termination notice in his late afternoon e-mails to Inter City's counsel.  (JA0427) MNA's notice indicated that it was being sent under the provision in the Commercial Customer Agreement purporting to allow for termination without cause, as well as for the stated ground of ICT's alleged "failure to vigorously and aggressively promote the sales of Michelin products as required by Section 6 of the Agreement." (JA0964).  The notice further claimed that Michelin had the right to terminate the agreement "with or without cause."  (Id.)  Inter City did not receive this notice until April 20, 2013.  (JA0748)

Three days later, on April 22, 2013, MNA issued two additional Notices of Termination to ICT -- one from Michelin's Earthmover Tires Division (the "Earthmover Tire Termination"), purporting to terminate the 2010 Commercial

13

Customer Agreement pursuant to Sections 6 and 28 of that agreement, and one

from Michelin's Small Tires Division (the "Passenger Tire Termination Notice"),

purporting to terminate the Passenger Tire Agreement "pursuant to Section 6 and

26 of Appendix F of that agreement." (JA0748; JA0749; JA0967; JA0970)

MNA's letters stated that it was terminating those other two agreements under

similar provisions purporting to allow for termination without cause, as well as for

the stated ground of ICT's alleged "failure to vigorously and aggressively

promote" the sale of Michelin products. (JA0967; JA0970)  Both notices claimed

that Michelin had the right to terminate ICT "with or without cause," and that the

terminations would be effective "30 days" from ICT's receipt of the notices. (Id.)

All three notices shall be referenced collectively as the "Termination Notices."

　　　Michelin did not identify any facts in the Termination Notices to validate the

purported basis to terminate the Dealer Agreements. (JA0964; JA0967; JA0970)

Moreover, Michelin executives had not informed Inter City of a single complaint

about Inter City's sales and promotional efforts during the several year period

leading up to the Termination Notices. (JA0749; JA0964; JA0967; JA0970)  In

fact, no Michelin representative or executive had ever stated or even hinted - - both

before and after the March 19, 2013 meeting - - that there was any risk that Inter

City might be terminated. (JA0749-JA0750)  In addition, no Michelin sales

executive had ever stated or suggested to ICT that it had failed to "aggressively

14

and vigorously" promote the sale of Michelin products. (JA0318; JA0749)

Rather, Michelin's statements and actions all reflected an intention to continue its

relationship with ICT. (JA0316) In addition, through multiple communications

between Inter City and Michelin representatives that took place between the March

19, 2013 settlement meeting and the date that Michelin filed suit, Michelin's sales

representatives repeatedly conveyed to Inter City, Michelin's ongoing commitment

to continuing its relationship with Inter City and improving its treatment of Inter

City going forward. (JA0316-JA0318)

G.    **The Instant Litigation**

Michelin commenced this action by filing a three-count, eight-page

complaint against Inter City. (JA0009-JA0016) Michelin's first count seeks a

declaratory judgment that Michelin is "not liable" for violations of the Civil RICO

statute, 18 U.S.C. § 1961, *et seq.*, the Sherman Anti-Trust Act, 15 U.S.C. § 1 *et*

*seq.*, and/or the Robinson-Patman Act, 15 U.S.C. § 13. (JA0013) In other words,

this count seeks a declaratory judgment of "non-liability" for some of the exact

substantive claims asserted by Inter City in its draft complaint, and which were the

subject of the ongoing settlement dialogue. Michelin's complaint also seeks a

declaration that the 2010 Commercial Customer Agreement had been terminated

because of an alleged breach by Inter City for "failure to vigorously and

aggressively promote the sales of Michelin products" and, further, because the

15

agreement purportedly allows Michelin to terminate ICT with or without cause. (JA0013-JA0014)  As with the Termination Notices, Michelin's Complaint provides no details about Inter City's alleged failures to "vigorously and aggressively promote the sales of Michelin products." (JA009-JA0016; JA0964; JA0967; JA0970)  Michelin also seeks damages for ICT's alleged breach of the 2010 Commercial Customer Agreement.  (JA0014-JA0015) Michelin amended its Complaint on April 30, 2013, to assert, among other things, additional causes of action relative to the other two termination notices under the 2009 Commercial Customer Agreement and the Passenger Tire Agreement.[2]  (JA0047-JA0068)

### H.    The New Jersey Case

Unaware that Michelin had commenced this case late in the afternoon of Friday, April 19, 2013, Inter City proceeded to file its Complaint against Michelin in the United States District Court for the District of New Jersey on Tuesday, April 23, 2013 (the "New Jersey Action").  (JA0328-JA0329; JA0331; JA0430-JA0490)  The Complaint that ICT filed was the exact same complaint that ICT had provided to Michelin's counsel at the March 19, 2013 settlement meeting approximately one month earlier.  (JA0330)

---

[2] On August 20, 2013, Michelin was granted leave to file a Second Amended Complaint, which seeks money damages for amounts ICT allegedly owes MNA following the termination of the Dealer Agreements.  (JA0008)  To date, MNA has not filed its Second Amended Complaint.  In any event, the allegations contained therein are not relevant to the issues on appeal.

16

On May 1, 2013, Inter City filed a First Amended Complaint in the New

Jersey Action, naming the terminated Michelin employees and another individual

as defendants and, further, seeking a declaration that Michelin's purported

terminations of the Dealer Agreements violated the New Jersey Franchise Practices

Act (the "NJFPA"). (JA0331; JA0430-JA0490) On that same date, ICT also

applied for injunctive relief, restraining and enjoining Michelin from terminating

the Dealer Agreements. (JA0331)

On Friday, May 17, 2013, the District of New Jersey issued an Order on

Inter City's application for a preliminary injunction in that case. The Order

provides, in part:

> Having carefully considered the parties' submissions…this Court, in
> an exercise of discretion: (a) stays this action forty-five (45) days to
> allow the Honorable Henry M. Herlong, Jr., United States District
> Judge for the District of South Carolina to determine whether the
> District of South Carolina or the District of New Jersey is the proper
> forum for this action, and (b) administratively terminates Inter City's
> Motion for Preliminary Injunction… .

(JA0331-JA0332; JA0717)

The District of New Jersey further noted the identity of a central issue raised

in both actions, namely "whether Michelin's termination notices are valid."

(JA0717) The District of New Jersey also directed Inter City, to the extent it

continued to seek injunctive relief to preserve the status quo, to make such

application in the South Carolina action. (Id.) Accordingly, on Monday, May 20,

17

2013, Inter City filed an answer and counterclaim in this case, seeking a

declaration that the Dealer Agreements constitute franchise agreements within the

meaning of and subject to the protections of the NJFPA and that MNA's purported

terminations of the Dealer Agreements violates the NJFPA. (JA0179)

Contemporaneously therewith, ICT also filed a motion with the District Court,

requesting such injunctive relief, restraining and enjoining Michelin from

terminating the Dealer Agreements. (JA0272-JA0275)[3] On May 22, 2013, the

District Court conducted a hearing on ICT's request for a temporary restraining

order and denied the motion, but took no action on ICT's motion for a preliminary

injunction (the "Preliminary Injunction Motion"). (JA0006)

## I.    The Request for an Evidentiary Hearing

On June 3, 2013, ICT filed a motion requesting an evidentiary hearing on the

Preliminary Injunction Motion, asserting, among other things, that "a full and

complete record -- developed at an evidentiary hearing -- was necessary to

determine" the Preliminary Injunction Motion, including the issues of whether the

Dealer Agreements are subject to the NJFPA and whether the Termination Notices

violate the NJFPA. (JA1092-JA1097) ICT requested such an evidentiary hearing

---

[3] On May 25, 2013, Inter City filed a Motion to Transfer Venue to the District of
New Jersey. (JA0006) The District Court denied the Motion to Transfer Venue on
August 20, 2013. (JA0008) Inter City is filing a motion with the District Court,
seeking the District Court's certification of certain issues decided in its venue
decision for interlocutory appeal to this Court pursuant to 28 U.S.C. § 1292(b).

because the issues of whether the Dealer Agreements are subject to the NJFPA and whether ICT stands to suffer irreparable harm as a result of the Termination Notices present a myriad of factual questions that are material to the Preliminary Injunction Motion, and which should only be decided on a full and complete record developed at an evidentiary hearing.[4] (Id.) MNA filed its response to ICT's motion on June 10, 2013 (JA1108), and ICT filed its Reply Brief on June 20, 2013 (JA1253).

On June 24, 2013, the District Court issued the Opinion and Order, in which it, among other things, held that (1) under South Carolina choice-of-law principles, the choice-of-law provisions in the Dealer Agreements, designating South Carolina law, are enforceable and govern the Dealer Agreements at issue; (2) given the enforceable choice-of-law provisions in the Dealer Agreements, the NJFPA does not apply to the Dealer Agreements; (3) because the NJFPA does not apply to the Dealer Agreements, there was no basis for conducting an evidentiary hearing; (4) because the NJFPA does not apply to the Dealer Agreements and since ICT premised its likelihood of success argument on the NJFPA, ICT did not prove that it is likely to succeed on its claim for violations of the NJFPA; and (5) ICT failed to meet its burden of proof that it would suffer irreparable harm because the

---

[4] A review of the papers filed with the District Court in connection with the Preliminary Injunction Motion readily reveals the multiple, material factual questions raised by the motion. (JA0276-JA0314; JA0315-JA0323; JA0720-JA0754; JA1016-JA1024; JA1092-JA1096; JA1253-JA1289)

19

"majority of Inter-City's arguments supporting its contention that it would suffer irreparable harm are solely based on financial loss." (JA1373-JA1384) This appeal followed. (JA1385)

## SUMMARY OF ARGUMENT

The District Court erred in finding, at the preliminary injunction stage, that certain choice of law provisions in the Dealer Agreements between the parties, which designate South Carolina law as governing disputes arising thereunder, are enforceable and that the New Jersey Franchise Practices Act (the "NJFPA") does not apply to those agreements. Under South Carolina conflict of laws principles, while choice of law provisions are generally enforced, an important exception to the general rule provides that such provisions will not be enforced if their enforcement would violate South Carolina public policy. Enforcement of the choice of law provisions in the Dealer Agreements would violate South Carolina public policy disfavoring races to the courthouse and forum shopping.

Armed with the knowledge that ICT was on the verge of filing suit against MNA for millions of dollars in damages suffered as a direct result of an illicit corruption scheme involving MNA employees, MNA mailed notice purporting to terminate one of the parties' dealer agreements and, contemporaneously therewith, filed this action in a strategic maneuver to beat ICT to the courthouse and secure

20

venue in South Carolina, in order to, among other things, avoid the potential reach of the NJFPA. By filing its complaint just one minute before telling ICT that settlement discussions had broken down, MNA beat ICT to the courthouse in the District of South Carolina, utilizing a declaratory judgment complaint seeking an adjudication of its "non-liability" for, among other things, Civil RICO and Robinson Patman Act causes of action that MNA knew ICT would file in New Jersey as soon as settlement discussions broke down. For nearly eighty years, the Fourth Circuit has explicitly recognized the impropriety of such declaratory judgment actions, filed "for the purpose of anticipating the trial of an issue in a court of coordinate jurisdiction." Aetna Cas. & Sur. Co. v. Quarles, 92 F.2d 321, 324 (4th Cir. 1937). It is also well settled that the act of "forum shopping" violates public policy under South Carolina law. See e.g., Nash v. Tidall Corp., 650 S.E 2d 81, 84 (S.C. 2007).

The strategic goal achieved by MNA's forum shopping and misuse of the Federal Declaratory Judgment Act was avoidance of the potential application of the NJFPA. Had ICT filed its substantive claims in New Jersey first, the choice of law provisions contained in the Dealer Agreements would be unenforceable as a matter of law in the event that the NJFPA applies to those agreements. Given that MNA's actions violate South Carolina public policy, MNA should be barred from enjoying the fruits of those actions, namely enforcement of the choice of law

21

provisions in the Dealer Agreements and potential avoidance of the reach of the NJFPA.

It is no mystery why MNA would want to stake venue here, rather than allow ICT to file its substantive claims in New Jersey. If the NJFPA applies to the Dealer Agreements, the statutory protections afforded by the NJFPA would be fatal to MNA's claim that it had the right to terminate the Dealer Agreements. Accordingly, ICT respectfully requests that this Court reverse the District Court's decision, hold that the choice of law provisions in the Dealer Agreements are unenforceable as a matter of law, and remand this case to the District Court to decide whether the NJFPA applies to the Dealer Agreements at issue in this case.

Moreover, even assuming, *arguendo*, that the choice of law provisions are not violative of South Carolina public policy under the circumstances of this case, they are nevertheless invalid under the conflict of laws principles set forth in the Restatement (Second) of Conflict of Laws, Section 187 (the "Restatement"). Although no decision was found where a South Carolina court adopted Section 187 of the Restatement in a conflict of laws analysis, other sections of the Restatement are routinely considered by South Carolina courts in deciding conflict of laws issues. Thus, there is no principled reason why a court sitting in South Carolina would disregard Section 187 of the Restatement. Under Section 187, if the Dealer Agreements satisfy the requirements of the NJFPA (and, it is respectfully

22

submitted, they do), the choice of law provisions in those agreements are unenforceable as a matter of law, and the District Court's conclusion to the contrary was erroneous.

In addition, since jurisdiction over this case is predicated on federal question, rather than diversity, jurisdiction, the District Court erred in failing to apply federal common law choice of law principles. Had the District Court applied federal common law choice of law principles, the court would have applied Section 187 of the Restatement, which, as discussed above, would render the choice of law provisions in the Dealer Agreements unenforceable if those agreements are subject to the protections of the NJFPA.

The District Court also erred in finding that the "instant choice-of-law provisions" in the Dealer Agreements "were included in arm's length, commercial agreements." This finding ignored the ample evidence in the record, and ICT's arguments in support thereof, that the choice of law provisions in the Dealer Agreements are unenforceable because they were the product of duress. Under South Carolina law, if a contract is executed under duress, it is voidable by the oppressed party.

The District Court also erred in failing to conduct an evidentiary hearing on ICT's request for a preliminary injunction. The District Court predicated its decision not to conduct an evidentiary hearing on its holding that the NJFPA does

23

not apply to ICT's claims as a matter of law. Since the District Court's decision was erroneous, so too was its decision not to conduct an evidentiary hearing. The determination of whether the NJFPA governs the Dealer Agreements is highly fact-intensive. The District Court's failure to conduct an evidentiary hearing in circumstances such as this, where a myriad of material, factual questions must be decided, constitutes reversible error.

Finally, the District Court erred in finding that, on the record before it, ICT will not suffer any irreparable harm through termination of the Dealer Agreements because the majority of injuries that it claims to have suffered constitute financial losses. This conclusion ignores applicable case law holding that irreparable harm, in the context of franchise agreements, can consist of the termination of a long-standing business relationship and the threatened loss of an enterprise. Here, ample evidence was submitted to the District Court of the termination of a long-standing business relationship and loss of an entire enterprise that would befall on Inter City if the termination notices are allowed to stand. The District Court erred in ignoring this evidence and applicable case law. Moreover, as with the question of whether the Dealer Agreements give rise to a franchise relationship protected by the NJFPA, the question of whether ICT is suffering irreparable harm as a result of MNA's actions also entails a fact-intensive inquiry. As such, the District Court

also committed reversible error in failing to hold an evidentiary hearing to decide the issue of irreparable harm.

Accordingly, through this appeal, ICT respectfully requests that the Fourth Circuit reverse the District Court's decision that the choice of law provisions in the Dealer Agreements are enforceable and that the NJFPA does not apply to the Dealer Agreements as a matter of law, and remand this matter to the District Court for an evidentiary hearing to decide whether ICT has a reasonable likelihood of success on its claims that: (1) the Dealer Agreements are franchise agreements within the meaning of the NJFPA; (2) MNA violated the NJFPA in issuing the Termination Notices, which are ineffective as a matter of law; and (3) ICT has suffered irreparable harm. In the alternative, ICT requests that the Court makes these findings on the record submitted to the District Court and remand this case to the District Court for the entry of a preliminary injunction, restraining and enjoining MNA from treating the Dealer Agreements as having been terminated.

## STANDARD OF REVIEW

This Court reviews the District Court's denial of a preliminary injunction motion for abuse of discretion. <u>Perry v. Judd</u>, 471 Fed.Appx. 219, 223-24 (4th Cir. 2012). Pursuant to this standard, while the District Court's factual findings are reviewed for "clear error," its legal conclusions are reviewed "de novo." <u>Pashby v. Delia</u>, 709 F.3d 307, 319 (4th Cir. 2013). In the context of preliminary

injunctions, this standard "is not a rule of perfunctory appellate review but one of careful scrutiny." <u>Direx Israel, Ltd. v. Breakthrough Medical Corp.</u>, 952 F.2d 802, 815 (4th Cir. 1991). Indeed, "a judge's discretion is not boundless and must be exercised within the applicable rules of law or equity." <u>Blackwelder Furniture Co. v. Seilig Mfg. Co.</u>, 550 F.2d 189, 193 (4ᵗʰ Cir. 1977).

## ARGUMENT

**I.** **The District Court Erred In Finding, At The Preliminary Injunction Stage, That The Choice Of Law Provisions In The Dealer Agreements Should Be Upheld And That The New Jersey Franchise Practices Act Does Not Apply To The Dealer Agreements As A Matter Of Law**

### A. Enforcement of the Choice of Law Provisions in the Dealer Agreements Would Violate South Carolina Public Policy under the Circumstances of this Case

The District Court made a choice of law determination in the Opinion and Order, which is subject to *de novo* review by this Court. Specifically, the District Court held that "as a matter of law, under South Carolina choice-of-law principles, the South Carolina choice-of-law provisions [in the Dealer Agreements] are enforceable and South Carolina law governs the agreements at issue." (JA1381) The Court further concluded that, under the enforceable choice of law provisions in the Dealer Agreements designating South Carolina law, the "NJFPA does not apply to the agreements at issue." (JA1382) In so ruling, the District Court commented that "[g]enerally, under South Carolina choice of law principles, if the parties to a contract specify the law under which the contract shall be governed, the

26

court will honor this choice of law." Id., quoting <u>Nucor Corp. v. Bell</u>, 482 F. Supp. 2d 714, 728 (D.S.C. 2007). The District Court further noted, however, an exception to this general rule, namely that "a choice-of-law clause in a contract will not be enforced if application of foreign law results in a violation of South Carolina public policy." <u>Nucor Corp.</u>, 482 F. Supp. 2d at 728; <u>see also</u> <u>Stonhard, Inc. v. Carolina Floor Specialists, Inc.</u>, 621 S.E.2d 352, 353-54 (S.C. 2005) (if terms of contract violate public policy in South Carolina, court will not enforce agreement); <u>Standard Register Co., v. Kerrigan</u>, 119 S.E.2d 533, 541 (S.C. 1961) (contract that is contrary to South Carolina public policy will not be enforced). This exception thus recognizes that South Carolina public policy considerations will render otherwise valid choice of law provisions inapplicable in appropriate cases. The District Court, however, declined to apply this exception to the instant case. This decision was erroneous because application of the choice of law provisions in the Dealer Agreements, under the circumstances of this case, would violate South Carolina public policy.

It is well settled that the act of forum shopping violates public policy under South Carolina law. <u>See e.g.</u>, <u>Nash</u>, 650 S.E. 2d at 84. As the Fourth Circuit has commented, "[i]t has long been established that courts look with disfavor upon races to the courthouse and forum shopping." <u>Learning Network, Inc. v. Discovery Communs Inc.</u>, 11 Fed. Appx. 297, 301 (4th Cir. 2001). Moreover, for

27

nearly eighty years, the Fourth Circuit has explicitly recognized the impropriety of declaratory judgment actions filed "for the purpose of anticipating the trial of an issue in a court of co-ordinate jurisdiction." Quarles, 92 F.2d at 324. Much more recently, in Learning Network, the Fourth Circuit, citing to Quarles, again commented on such misuse of declaratory judgment actions, stating:

> In some cases, there may come a point after which the potential lawsuit that may otherwise have given rise to a proper declaratory judgment action has become so certain or imminent, that the declaratory judgment action is merely an improper act of forum shopping, or a race to the courthouse.

Learning Network, 11 Fed. Appx. at 301, citing Quarles and Citigroup Inc. v. City Holding Co., 97 F. Supp. 2d 549, 557 (S.D.N.Y. 2000). Noting that, "[i]t has long been established that courts look with disfavor upon races to the courthouse and forum shopping," the Court went on to state, "[s]uch procedural fencing is a factor that counsels against exercising jurisdiction over a declaratory judgment action." Id., citing Myles Lumber Co. v. CNA Fin. Corp., 233 F.3d 821, 824 (4th Cir. 2000); see also Nautilus Ins. Co. v. Winchester Homes, Inc., 15 F.3d 371, 377 (4th Cir. 1994); see e.g., Centennial Life Ins. v. Poston, 88 F.3d 255, 258 (4th Cir. 1996) (court declines "to place undue significance on the race to the courthouse door, particularly in the instance where [the plaintiff] had constructive notice of the [defendants'] intent to sue" and understandable circumstances delayed the filing of the suit); AmSouth Bank v. Dale, Inc., 386 F.3d 763, 788 (6th Cir. 2006)("Courts

28

take a dim view of declaratory plaintiffs who file their suit mere days or weeks before the coercive suits filed by a natural plaintiff and who seem to have done so for the purpose of acquiring a favorable forum"). Hence, it is well settled under South Carolina law that forum shopping, including the misuse of declaratory judgment actions to beat an adversary to the courthouse, violates South Carolina public policy.

The record before the District Court amply demonstrates that MNA filed this case, through an improper use of a declaratory judgment action, to pre-empt Inter City's planned suit in the District of New Jersey -- an act of pure forum shopping that violates South Carolina public policy. Moreover, and as described in further detail below, the result of MNA's forum shopping (and a result that MNA apparently planned from the outset) is the avoidance of the potential application of the New Jersey Franchise Practices Act (the "NJFPA") to the Dealer Agreements at issue in this case. Indeed, had ICT filed its substantive claims in New Jersey first, and if the NJFPA applies to the Dealer Agreements, the choice of law provisions in those agreements would be unenforceable as a matter of law. MNA, however, strategically commenced suit here first, in an apparent attempt to avoid the application of the NJFPA, because, if applicable, the NJFPA would render the Termination Notices invalid as a matter of law. Given that MNA's actions violate South Carolina public policy, MNA should be barred from enjoying the fruits of

29

those actions, i.e., enforcement of the choice of law provisions in the Dealer Agreements and avoidance of the NJFPA.

The whole genesis of this litigation stems from ICT's discovery, in or about late 2011, of incontrovertible proof of Michelin's unfair and predatory pricing practices that caused Inter City to sustain millions of dollars in damages, and Inter City's efforts to settle its affirmative claims in a confidential setting. (JA0329) At a March 19, 2013 settlement meeting, Inter City presented Michelin with an exact copy of the complaint it intended to file in the District of New Jersey. (JA0330) Inter City also agreed to refrain from filing its complaint while the parties engaged in confidential settlement discussions if Michelin signed a tolling agreement (which Michelin proceeded to do one week later). (Id.) At no time before, during, or after the March 19 meeting did Michelin ever state, suggest or intimate that it had any affirmative claim against Inter City; that it had any reason to terminate any of its Dealer Agreements with Inter City; and/or that it was considering filing a lawsuit against Inter City. (Id.; JA0318; JA0328-JA0333; JA0750) Rather all discussions centered around potential resolution of Inter City's claims against Michelin. (Id.)

As described in greater detail in the Statement of Facts, above, Michelin's actions and statements in the months prior to suit served its carefully orchestrated strategy to beat Inter City to the courthouse and secure venue in South Carolina

before Inter City had any chance of learning of its plans, in order to avoid the potential reach of the NJFPA.  (JA0330-JA0331)  In fact, the discussions between ICT and MNA business people during this timeframe reflected an intention to continue doing business together.  (JA9747-JA0750; JA0316-JA0318)   Inter City did not know -- and had no reason to know -- of any affirmative claims Michelin intended to assert against it.  (Id.)

Secure in its understanding that, as agreed, Inter City would refrain from filing its Complaint in the District of New Jersey while settlement remained ongoing, Michelin mailed a notice purporting to terminate one of the parties' Dealer Agreements and then commenced this case just one minute before informing ICT that settlement discussions had broken down.  (JA0328-JA03333)  In short, MNA's commencement of this case was pure forum shopping and, therefore, violative of South Carolina public policy.

The complaint that Michelin filed to beat Inter City to the courthouse also bears the hallmarks of forum shopping.  In its haste to bring suit, Michelin filed a short, three count complaint.  Count I seeks a declaratory judgment of its "non-liability" for two of the causes of action asserted against Michelin in the District of New Jersey, namely, violations of the Federal RICO statute, 18 U.S.C § 1961 *et seq.* and the Robinson-Patman Act, 15 U.S.C. § 13.  (JA0013)  In other words, Michelin is seeking an adjudication of its alleged non-liability for the precise

31

substantive claims that it understood, from its receipt of Inter City's draft complaint, Inter City would be asserting against it in the New Jersey Action the minute settlement discussions broke down. This very type of declaratory judgment action, filed "for the purpose of anticipating the trial of an issue in a court of co-ordinate jurisdiction," is precisely what the Fourth Circuit has deemed improper for nearly eighty years. Quarles, 92 F.2d at 324.

Since South Carolina has a strong public policy of discouraging such races to the courthouse, Michelin should not be rewarded for doing just that through enforcement of the choice of law provisions in the Dealer Agreements. See e.g., Volvo Const. Equip. N. Am. v. CLM Equip. Co., 386 F.3d 581, 600 (4th Cir. 2004) (choice of law rules of court that should rightfully hear case should be applied); see also Needbasedapps, LLC v. Robbins, 2013 U.S. Dist. LEXIS 24187 (W.D. Tex. 2013) (second-filed court's choice of law applies when case is transferred pursuant to exception to first-filed rule).

A consideration of New Jersey law, and the NJFPA, reveals why MNA would want to stake venue here, rather than allow ICT to file its substantive claims in New Jersey first. Indeed, the statutory protections afforded by the NJFPA could very well prove fatal to MNA's claim that it had the right to terminate the Dealer Agreements.

32

If the parties' disputes were pending in New Jersey (as they would be, but

for Michelin's improper forum shopping), New Jersey choice of law principles

would apply.  New Jersey follows Section 187 of the Restatement (Second) of

Conflict of Laws in deciding whether to enforce contractual choice of law

provisions.  See e.g., Instructional Sys., Inc. v. Computer Curriculum Corp., 614

A.2d 124, 133 (N.J. 1992), quoting the Restatement (Second) of Conflict of Laws

§ 187 (1969).    Section 187 provides in pertinent part:

> § 187.  Law of the State chosen by the parties
>
> (2)  The law of the state chosen by the parties to govern their contractual
> rights and duties will be applied…unless either
>
> (a)    The chosen state has no substantial relationship to the parties or the
> transaction and there is no other reasonable basis for the parties'
> choice, or
>
> (b)    Application of the law of the chosen state would be contrary to a
> fundamental policy of a state which has a materially greater interest
> than the chosen state in the determination of the particular issue and
> which, under the rule of § 188, would be the state of the applicable
> law in the absence of an effective choice of law by the parties.

See Restatement (Second) Conflict of Laws § 187.[5]

---

[5] Section 188, which sets forth the law governing in the absence of a choice of law
provision, provides that the "rights and duties of the parties with respect to an issue
in contract are determined by the local law of the state which, with respect to that
issue, has the most significant relationship to the transaction and the parties … ."
See Restatement (Second) Conflict of Laws § 188(1).  The evidence establishes
that New Jersey has the "most significant relationship to the transaction and the

Under Section 187, a choice of law provision contained in a contract will not be enforced if it would violate a fundamental policy of the state that has a materially greater interest than the chosen state in determining the particular issue and if that state's law would apply in the absence of an effective choice of law provision. See e.g., Instructional Sys., 614 A.2d at 133, quoting the Restatement (Second) of Conflict of Laws § 187 (1969). Here, New Jersey, which is where Inter City is located and conducts business, including business under the Dealer Agreements at issue in this case, has a materially greater interest than South Carolina in determining whether dealer agreements that are performed in New Jersey have been wrongfully terminated. Moreover, if the NJFPA applies to the Dealer Agreements (and it is respectfully submitted that it does), application of South Carolina law to the Dealer Agreements would be contrary to a fundamental policy of New Jersey.

The text of the NJFPA makes it clear that the Act embodies a "fundamental policy" of the State of New Jersey. Section 56:10-2 of the NJFPA explicitly proclaims:

> The Legislature finds and declares that distribution and sales through franchise agreements in the State of New Jersey vitally affects the general economy of the State, the public interest and the public welfare. It is therefore necessary in the public interest to define the relationship and responsibilities of franchisors and franchisees in

parties." ICT is based in New Jersey, and the work under the Dealer Agreements took place almost entirely in New Jersey. (JA0720-JA0993)

34

connection with franchise arrangements and to protect franchisees
from unreasonable termination by franchisors that may result from a
disparity of bargaining power between national and regional
franchisors and small franchisees.

See N.J.S.A. Section 56:10-2.

The controlling case law also recognizes the NJFPA as reflecting a

fundamental policy of New Jersey.  See e.g., Instructional Sys., 614 A.2d at 135

("As the [NJFPA] and the cases interpret it make clear, New Jersey has a strong

policy in favor of protecting its franchises.")  It is well settled that given these

policy considerations, choice of law provisions in agreements subject to the

NJFPA do not trump the Act.  See e.g., Dunkin' Donuts Franchised Restaurants

LLC v. Strategic Venture Grp, Inc., No. 07-1923, 2010 U.S. Dist. LEXIS 119417,

*11-12 (D.N.J. Nov. 10, 2010) (NJFPA trumps Massachusetts choice of law

provision); Red Roof Franchising LLC v. Patel, 877 F. Supp. 2d 124, 130 (D.N.J.

2012) (NJFPA renders Texas choice of law provision invalid); Instructional Sys.,

614 A.2d at 135 (NJFPA renders California choice of law provision invalid);

Winer Motors, Inc. v. Jaguar Rover Triumph, Inc., 506 A.2d 817, 820 (N.J. Super.

Ct. App. Div. 1986) ("New Jersey would apply its local law to govern the

relationship between an out-of-state franchisor and a New Jersey franchisee");

Cooper Distrib. Co., Inc. v. Amana Refrigeration, Inc., 63 F.3d 262, 268-69 (3d

Cir. 1995) (NJFPA renders Iowa choice of law provision invalid); S. States Coop.,

Inc. v. Global AG Assoc., Inc., No. 06-1494, 2008 WL 834389 (E.D. Pa. Mar. 27,

35

2008) (NJFPA renders Virginia choice of law provision invalid); <u>Emergency</u>

<u>Accessories & Installation, Inc. v. Uhelen Eng'g Co.</u>, 2009 U.S. Dist. LEXIS

46956, at *6 n.5 (D.N.J. June 3, 2009) (applying New Jersey law according to the

NJFPA even though Master Distributor Agreement states that it shall be governed

by Connecticut law). Accordingly, under New Jersey choice of law principles, the

NJFPA would apply, assuming the factual predicates for applying that statute are

satisfied.[6]

The reason why MNA would want to avoid application of the NJFPA is

because of the substantial protections afforded to franchisees under the NJFPA.

Once a franchise relationship begins, all that a franchisee must do is comply

substantially with the terms of the agreement, in return for which it receives the

benefit of an "infinite" franchise. The franchise arrangement cannot be terminated

or refused renewal without good cause and without appropriate notification.

N.J.S.A. § 56:10-5; <u>Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.</u>, 495

A.2d 66 (N.J. 1985). "Good cause" is limited under the Act to the failure of a

franchisee substantially to comply with the requirements of the franchise

agreements. N.J.S.A. § 56:10-5; <u>Maintainco Inc. v. Mitsubishi Caterpillar Forklift</u>

<u>Am., Inc.</u>, 975 A.2d 510, 518 (N.J. Super. 2009); <u>Dunkin' Donuts of Am.</u>, 495

A.2d at 68-70 (franchisee's deliberate underreporting of sales, which it refused to

---

[6] The record amply demonstrates that the applicable criteria for application of the
NJFPA are satisfied. <u>See</u> footnote 8, *infra,* at p. 38.

cure, was a material breach justifying termination); Simmons v. Gen. Motors Corp., 435 A.2d 1167, 1171 (N.J. Super. 1981) (sale by car dealer of its franchise without required notice or permission of manufacturer-franchisor to purchaser with bad reputation "who was justifiably found unacceptable to the franchisor . . . constituted a 'substantial breach' of [the franchisee's] obligations under the franchise agreement," and thus provided statutory grounds for termination), cert. denied, 88 N.J. 498 (1981); Gen. Motors Corp. v. New A.C. Chevrolet, 91 F. Supp. 2d 733, 738-41 (D.N.J. 2000) (addition by a Chevrolet dealer of a Volkswagen franchise at its premises without permission of the manufacturer-franchisor constituted failure of substantial compliance with the agreement's reasonable terms, justifying termination), aff'd, 263 F.3d 296 (3d Cir. 2001).

Moreover, the statutory good cause requirement supersedes contrary termination provisions in private contracts. Gen. Motors Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 319 (3d Cir. 2001) (citing Westfield Ctr. Serv., Inc. v. Cities Serv. Oil Co., 432 A.2d 48, 53 (N.J. 1981)) ("Even if the terms of a private franchise agreement permit termination at will, § 56:10-5's good cause requirement will supersede that arrangement and impose a good cause requirement on the franchisor's decision.")

Finally, the Act sets forth a strict 60 day notification provision before a good cause termination can take effect. N.J.S.A. § 56:10-5. If the NJFPA were found to

apply to the Dealer Agreements, MNA would not have had the right to terminate the Dealer Agreements because MNA had no basis to establish that ICT failed "substantially to comply with the requirements of the franchise agreements" and, further, because it did not provide the requisite 60 day notice.  Thus, through forum shopping and misuse of the Federal Declaratory Judgment Act (in derogation of South Carolina public policy), MNA has sought to avoid application of the NJFPA.  MNA should not be permitted to reap the rewards of its actions in derogation of South Carolina public policy.[7]

Because the District Court found that the South Carolina choice of law provisions in the Dealer Agreements are enforceable and the NJFPA does not apply to the Dealer Agreements as a matter of law, it never reached the issue of whether the Dealer Agreements are subject to the protections of the NJFPA.  Accordingly, ICT respectfully requests that this Court reverse the District Court's decision, hold that the choice of law provisions are unenforceable as a matter of law, and remand the case to the District Court to decide whether the NJFPA applies to the Dealer Agreements at issue in this case.[8]

---

[7] Under <u>Glaesner v. Beck</u>, 791 F.2d 384 (4th Cir. 1986), New Jersey law would apply to any tort claims or statutory claims based in tort.   To the extent MNA's actions are viewed as sounding in tort, rather than in contract, this would be another reason why New Jersey law would apply, notwithstanding the existence of the consent to jurisdiction clauses.

[8] ICT does not specifically recount in this brief the abundant evidence submitted to the District Court establishing that ICT satisfies each criteria for being deemed a

**B.** **The District Court Erred in Failing to Apply Section 187 of the Restatement (Second) of Conflicts of Laws**

Citing to <u>Team IA, Inc. v. Lucas</u>, 717 S.E.2d 103, 109 (S.C. 2011), the District Court found that "[t]he only recognized exception to adhering to the parties' choice of law provision does not apply [to this case] because the contract designated South Carolina law, and it is being interpreted here in South Carolina." (JA1381)  The "only recognized exception" to which the District Court referred involves choice of law clauses selecting other states' laws where the enforcement of the choice of law provision would violate *South Carolina* public policy.  (<u>Id</u>.) Implicit in the District Court's decision, therefore, is a finding that Section 187 of the Restatement is not recognized by South Carolina courts.  This implicit finding of the District Court, however, is erroneous.  South Carolina courts commonly look to various sections of the Restatement (Second) of Conflict of Laws in making choice of law determinations.  Accordingly, applying the exception set forth in Section 187 of the Restatement -- which looks to whether enforcement of the choice of law provision would violate public policy of a state with a materially

---

"franchisee" subject to the protections afforded by the NJFPA.  (JA0293-JA0308; JA1016-JA1024; JA0315-JA0323; JA0720-JA0753;  JA1275-JA1289)  It is respectfully submitted that this Court need not reach this issue because this case should be remanded to the District Court to make that determination, upon reversal of the District Court's choice of law ruling.

39

greater interest than the chosen state in the determination of the issue to be decided -- would comport in general with South Carolina law on conflicts of laws analyses.

For example, in <u>Menezes v. WL Ross & Co.</u>, 744 S.E.2d 178, n.2 (S.C. 2013), the court specifically noted that "South Carolina courts generally follow the traditional choice of law rules as stated in the Restatement of Conflict of Laws." Other cases - - from both South Carolina state and federal courts - - similarly look to the Restatement (Second) of Conflict of Laws in making choice of law determinations.  See e.g., <u>Russell v. Wachovia Bank, N.A.</u>, 578 S.E.2d 329, 335 (S.C. 2003) (applying Sections 268-279 of the Restatement to choice of law analysis involving trust documents); <u>S.C. Dept of Parks v. Brookgreen Gardens</u>, 424 S.E.2d 465, 468 (S.C. 1992) (applying Section 223 of the Restatement to choice of law analysis involving real estate conveyance transfers); <u>Scott v. Guardsmark Sec.</u>, 874 F. Supp. 117 (D.S.C. 1995) (overriding Tennessee choice of law provision in employment contract because South Carolina has greater interest in dispute than Tennessee, citing Section 187 of the Restatement); <u>Nienow v. Nienow</u>, 268 S.C. 161 (1977) (Court cites to Section 84(c) of the Restatement (Second) of Conflict of Laws); <u>Mitchell v. Mitchell</u>, 266 S.C. 196 (1976) (Court cites to Section 99 of the Restatement (Second) of Conflict of Laws; <u>Canal Ins. Co. v. Ranger Ins. Co.</u>, 489 F. Supp. 492 (D.S.C. 1980) (court applies principles set forth in Section 193 of the Restatement (Second) of Conflict of Laws (1971)).

Moreover, at least one District Court sitting in South Carolina has explicitly

referred to Section 187 of the Restatement, albeit in a different context.  <u>See</u>

<u>Associated Spring Corp. v. Wilson</u>, 410 F. Supp. 967, 975 (D.S.C. 1976) (noting

that South Carolina lex loci doctrine "is generally in conformity with that of the

Restatement (Second) of Conflict of Laws § 187").

　　　　Since South Carolina courts apply the Restatement in various choice of law

contexts, the District Court can and should have applied Section 187 in

determining whether to enforce the choice of law provisions in the Dealer

Agreements.  Under Section 187 of the Restatement, the District Court would have

concluded that the choice of law provisions in the Dealer Agreements "would be

contrary to a fundamental policy of a state which has materially greater interest

than the chosen state in the determination of the particular issue and which…would

be the state of the applicable law in the absence of an effective choice of law by the

parties."  <u>See</u> pp. 32 to 38, <u>*supra*</u>.  <u>See also</u> Restatement (Second) Conflict of Laws

§ 187(2)(b).

### C.    The District Court Erred in Finding that Federal Common Law Does not Govern Choice of Law Questions Concerning Supplemental State Law Claims Where Jurisdiction Is Premised on a Federal Question.

In the Opinion and Order, the District Court also held that state choice of

law principles, rather than federal common law, govern supplemental state law

claims in a case where, as here, the court's jurisdiction is premised on a federal question. This finding, however, was erroneous and should be reversed.

Where a court's jurisdiction is premised on federal question jurisdiction, courts have applied federal common law choice of law rules to make choice of law determinations. See e.g., Detroit Edison Co. v. Pac. Ins. Co., 742 F. Supp. 287, 289 (M.D. N.C. 1990), aff'd, 944 F.2d 901 (4th Cir. 1991) (federal common law choice-of-law rules should be applied in federal question case), citing Edelmann v. Chase Manhattan Bank, N.A., 861 F.2d 1291, 1294 (1st Cir. 1988) (federal court with federal question jurisdiction should apply federal common law to select proper state law to decide supplemental state law claims).[9] Because this Court's jurisdiction is premised on federal question, rather than diversity, jurisdiction, the District Court could have looked to federal common law principles in deciding the choice of law question.

Under federal common law, courts decide choice of law questions based on the Restatement (Second) of Conflict of Laws. Detroit Edison Co., 742 F. Supp. at 289, citing Edelmann, 861 F.2d at 1295; see also Volvo Constr. Equip. N. Am., 386 F.3d, at 602-3 (North Carolina relies on the Restatement to determine whether

---

[9] In ICTO Corp. v. Michelin Tire Corp., Commercial Div., 722 F.2d 42, 49 n.11 (4th Cir. 1983), this Court noted in a footnote that in federal question cases, a district court entertaining pendant state claims should follow the choice of law rules of the forum state. In Detroit Edison, however, the Fourth Circuit cited to the First Circuit's decision in Edelmann, which applied federal common law principles to decide choice of law questions concerning supplemental state law claims.

42

to honor choice-of-law provision in contract); <u>Chuidian v. Philippine Nat'l Bank</u>, 976 F.2d 561, 564 (9th Cir. 1992) ("federal common law follows the approach of the Restatement Second of Conflict of Laws"); <u>Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.</u>, 585 F.3d 236 (5th Cir. 2009) (court applied Restatement to make choice of law determination). As explained in Sections A and B, above, had the District Court applied Section 187 of the Restatement, the court would have concluded that if the NJFPA applies to the Dealer Agreements, the choice of law provisions contained in those agreements would be unenforceable as a matter of law.

### D. The Choice Of Law Provisions In The Dealer Agreements Are Unenforceable Because They Were Executed Under Duress

Even if the NJFPA did not trump the choice of law provisions in the Dealer Agreements, the District Court nevertheless erred in finding that the "instant choice-of-law provisions were included in arm's length, commercial agreements" and ignoring the ample evidence in the record that the choice of law provisions are unenforceable because they were the product of duress. (JA1381)

As ICT Vice President Vidal Erbesh explained in an affidavit submitted to the District Court, the choice of law provisions in the Dealer Agreements were hardly the product of arms' length negotiations between parties of equal bargaining power. (JA1283-JA1284) To the contrary, Michelin refused to change the choice of law (or any other) provisions in the agreements before execution, advising that

43

they were "non-negotiable" and that no one in "Michelin legal" would even discuss it with Mr. Erbesh. Michelin unequivocally demanded that ICT sign the agreements as drafted or risk loss of several hundred thousands of dollars in earned credits for past sales. (Id.) Indeed, MNA made it crystal clear to ICT that ICT had no choice but to sign the agreements, as drafted, in order to receive payment for past business. Under South Carolina law, if a contract is executed under duress, it is voidable by the oppressed party. See e.g., Santee Portland Cement Corp. v. Mid-State Redi-Mix Concrete Co., 260 S.E.2d 178 (S.C. 1979); Phillips v. Baker, 325 S.E.2d 533 (S.C. 1985). Here, because the choice of law provisions in the Dealer Agreements were executed under economic duress, those provisions are unenforceable as a matter of law. The District Court's failure to consider the evidence of duress and determination that the choice-of-law provisions were included in "arm's length, commercial agreements" were erroneous.

## II.    The District Court Erred In Failing To Grant ICT's Request For An Evidentiary Hearing.

The District Court premised its decision to deny ICT's request for an evidentiary hearing on its ruling that, as a matter of law, the NJFPA does not apply to the Dealer Agreements given the South Carolina choice of law provisions contained therein. (JA1382) As set forth above, however, that ruling was erroneous. Moreover, because the District Court made this ruling of law, it never reached the issue of whether the NJFPA would apply to the Dealer Agreements in

the absence of the contractual choice of law provisions. ICT submits that an evidentiary hearing is required to determine: (1) whether the NJFPA applies to the Dealer Agreements; (2) whether ICT has a likelihood of success on its claim for violation of the NJFPA; and (3) whether ICT is suffering irreparable harm as a result of the purported determinations. Accordingly, ICT respectfully requests that this Court remand this case back to the District Court to conduct such an evidentiary hearing.

The determination of whether the NJFPA governs the Dealer Agreements is highly fact-intensive. The NJFPA prohibits terminations of franchisees without "good cause." (JA0306) Thus, if the Dealer Agreements are subject to the NJFPA, the Termination Notices would be declared null and void under the NJFPA absent "good cause" for the terminations within the meaning of the NJFPA. Accordingly, a threshold issue for the District Court -- and an issue that the District Court did not reach -- is whether ICT meets the criteria to be considered a "franchisee" and is therefore entitled to the protections of the NJFPA. If ICT is found to be a "franchisee" under the NJFPA, the District Court would turn to whether there was "good cause" for MNA's terminations -- another issue that the District Court did not reach. Both inquiries are highly fact intensive, which is why ICT requested an evidentiary hearing before the District Court.

The NJFPA defines a "franchise" as a:

Written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

See N.J.S.A. § 56:10-3.

The Act applies:

To a franchise (1) the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey, (2) where gross sales or products or services between the franchisor and franchisee covered by such franchise shall have exceeded $35,000.00 for the 12 months next preceding the institution of suit pursuant to this act, and (3) where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise . . .

Id. § 56:10-4.

There are five statutory elements that must be satisfied in order for an

arrangement to be deemed a "franchise" under the Act:

(1)    The franchisor granted a "license" to the franchisee;

(2)    A "community of interest" exists between the franchisor and the franchisee;

(3)    The gross sales of product or services exceed $35,000 for the 12 months preceding the institution of the lawsuit;

(4)    More than 20% of the franchisee's gross sales are intended to be or are derived from its franchise; and

(5)    The parties contemplated that the franchisee would maintain a "place of business in New Jersey."

Id. §§ 56:10-3(a), 10-4.

46

While ICT submits that the evidence that it submitted was more than sufficient to show that ICT has a likelihood of success on the merits of its claim that ICT is a "franchisee" within the meaning of the NJFPA and that there was no "good cause" for the terminations[10], if the Court had any doubt in that regard, it was required, as a matter of law, to conduct an evidentiary hearing to resolve these issues.

All of the statutory elements that must be considered in determining whether a franchise arrangement exists within the meaning of the NJFPA raise multiple, material questions of fact. Where factual disputes are present, the "parties must be given a fair opportunity and meaningful hearing to present their differing versions of those facts" before a court will rule on a request for injunctive relief. Kaepa, Inc., v. Achilles Corp., 76 F.3d 624, 628 (5th Cir. 1996); see also McDonald's Corp. v. Robertson, 147 F.3d 1301, 1312 (11th Cir. 1998) ("[W]here facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held"). The failure to hold an evidentiary hearing to resolve highly contested factual issues will give rise to reversible error. See e.g., All Care Nursing Serv., Inc. v. Bethesda Mem. Hosp., Inc., 887 F.2d 1535, 1539 (11th Cir. 1989) ("In this complex antitrust action, where much depends upon the accurate presentation of numerous facts, the trial

---

[10] See footnote 8, *supra.*

47

court erred in not holding an evidentiary hearing to resolve these highly contested issues"); <u>Warner Chilcot Labs Ireland Ltd. V. Mylan Pharms, Inc.</u>, 451 Fed Appx. 935, 939 (Fed. Cir. 2011) ("In the Third Circuit, as in other circuits, a district court cannot issue a preliminary injunction that depends upon the resolution of disputed issues of fact unless the court first holds an evidentiary hearing").  Given the multiple factual issues presented by ICT's request for injunctive relief, the District Court erred in failing to give the parties a fair opportunity -- at an evidentiary hearing -- to present evidence on their differing versions of those facts before rendering its decision.

**III.    The District Court Erred In Finding That ICT Has Not Suffered Irreparable Harm**

Finally, the District Court erred in finding that ICT has not suffered irreparable harm.  In the Opinion and Order, the District Court denied ICT's request for injunctive relief on the grounds that the "majority of Inter-City's arguments supporting its contention that it would suffer harm are solely based on financial loss."  (JA1383-JA1384)  This finding was erroneous, however, as it ignores applicable case law developed in the context of franchise agreements discussing what gives rise to "irreparable harm."

It has been recognized in the franchise context that "the loss of business and good will, and the threatened loss of the enterprise itself, constitute irreparable injury to the plaintiff sufficient to justify the issuance of a preliminary injunction."

48

Beilowitz v. General Motors Corp., 233 F. Supp.2d 631, 644 (D.N.J. 2002) (citing

Carlo C. Gelardi Corp. v. Miller Brewing Co., 421 F. Supp. 233, 236 (D.N.J.

1976); Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir.

1970); see also Atl. City Coin & Slot Serv. Co. v. IGT, 14 F. Supp.2d 644, 667-68

(D.N.J. 1998); Emergency Accessories, 2009 U.S. Dist. LEXIS 46956, at *16-18.

Moreover, the loss of a long-standing franchise arrangement will give rise to

irreparable harm.  In this regard, in Emergency Accessories, the Second Circuit

examined what constitutes "irreparable injury" in the context of franchise

terminations, and specifically held that while "past profits would afford a basis for

calculating damages for wrongful termination," the right to continue a long-term

relationship "is not measureable entirely in monetary terms." Emergency

Accessories, 2009 U.S. Dist. LEXIS 46956, *17 (quoting Semmes, 429 F.2d at

1205).   The Court further commented that "a 'judgment for damages acquired

years after [a franchisee's] franchise has been taken away and his business

obliterated is small consolation to one who, as here, has had a . . . franchise' for

many years."  Id.

    The District Court failed to address this case law, developed in the franchise

context, that specifically recognizes the irreparable harm that befalls long-term

franchisees through the termination of franchise arrangements, even though money

damages may be available to remedy at least some harm.  As set forth in the

49

affidavits that ICT submitted to the District Court, if MNA's termination of ICT as a long-term authorized Michelin dealer is permitted to stand, ICT's business will suffer devastating impacts and irreversible harm -- harm that cannot be remedied through money damages.  (JA0315-JA0323; JA0720-JA0751; JA1275-JA1290)

The District Court also ignored the substantial evidence before it that shows that MNA's termination of the Dealer Agreements is destroying Inter City's business and will result in the loss of an enterprise.  (JA0750-JA0752; JA0320-JA0322)  In this regard, the District Court erred in failing to consider the evidence of the impact of the terminations on ICT affiliate, ICR, and the overall Inter City enterprise.  As explained in the papers submitted to the District Court, the termination of ICT as a new tire dealer will not only cripple ICT's new tire sales but will also have the collateral effect of eliminating the "cradle to grave" premise upon which ICR has predicated its retread tire business -- something that Michelin itself has acknowledged in conversations with ICT.  (JA1020-JA1023; JA1285-JA1288)  As further explained, the terminations will result in an economic death sentence to the Inter City enterprise (i.e., ICT and ICR).  (JA0720-JA0753)  See also Bateman v . Ford Motor Co., 302 F.2d 63, 66 (3d Cir. 1962) ("a judgment for damages acquired years after his franchise has been taken away and his business obliterated is small consolation to one who, as here, had a Ford franchise for many years"); McCarthy v. Arnold Foods Co., Inc., 717 F. Supp. 325, 329 (E.D. Pa.

1989) (plaintiff successfully argued irreparable harm in the termination of a

fourteen-year old wholesalership). If Michelin's terminations are allowed to stand,

Inter City will suffer irreparable harm consisting of the exact type of "threatened

loss of the enterprise" that justifies the issuance of a preliminary injunction.

Beilowitz, 233 F. Supp.2d at 644; Minard Run Oil Co. v. U.S. Forest Serv., 670

F.3d 236, 255 (3d Cir. 2011); see also JA0320-JA0323.[11]

    In any event, as with the question of whether the Dealer Agreements give

rise to a franchise arrangement subject to the NJFPA, the question of whether ICT

is suffering irreparable harm also entails a fact-intensive inquiry. As such, the

District Court committed reversible error in failing to hold an evidentiary hearing

to decide, among other issues, the issue of irreparable harm. Warner Chilcot Labs

Ireland, 451 Fed. Appx. at 939 (evidentiary hearing is required where preliminary

injunction requests depend on resolution of disputed issues of fact).

---

[11] Considering the impact of ICR on the enterprise is entirely appropriate, as the
Fourth Circuit has held that a "court should consider the effects of preliminary
injunctive relief on any nonparties who may possess a significant interest in the
outcome." Hughes Network Sys. V. Interdigital Commc'ns Corp., 17 F.3d 691,
696 (4th Cir. 1994), citing Kershner v. Mazurkieqicz, 670 F.2d 440, 443 (3d Cir.
1982); see also Merrill Lynch, Pierce, Fenner & Smith v. Rodger, 75 F. Supp.2d
375, 380 (M.D. Pa. 1999) ("the Third Circuit has also stated a fifth factor that the
Court should consider, 'the possibility of harm to other interested persons from the
grant or denial of the injunction.'"), quoting Ortho Pharmaceutical Corp. v.
Amgen, Inc., 882 F.2d 806 (3d Cir 1989).

## CONCLUSION

For the reasons stated above, ICT respectfully requests that the Fourth Circuit reverse the District Court's decision that the choice of law provisions in the Dealer Agreements are enforceable and that the NJFPA does not apply to the Dealer Agreements as a matter of law, and remand this matter to the District Court for an evidentiary hearing to decide whether ICT has a reasonable likelihood of success on its claims that: (1) the Dealer Agreements are franchise agreements within the meaning of the NJFPA; (2) MNA violated the NJFPA in issuing the Termination Notices, which are ineffective as a matter of law; and (3) ICT has suffered irreparable harm.  In the alternative, ICT requests that the Court makes these findings on the record submitted to the District Court and remand this case to the District Court for the entry of a preliminary injunction, restraining and enjoining MNA from treating the Dealer Agreements as having been terminated.

## STATEMENT AS TO WHY ORAL ARGUMENT
## SHOULD BE HEARD

In accordance with Local Rule 34(a), Inter City Tire and Auto Center, Inc. ("ICT") respectfully requests that this Court allow oral argument to be heard on this appeal. ICT submits that the arguments presented on appeal fall outside what would normally be presented in an appeal from a decisions denying a request for injunctive relief. The issues presented rely heavily on choice of law determinations that must be considered in light of an expansive factual and procedural record. Given the substantial factual and procedural record that needs to be considered to resolve the issues on appeal, ICT respectfully submits that this case is uniquely in need of oral argument, as the issues can best be understood by the Panel with the assistance of argument from counsel.

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(c), the undersigned certifies that this brief complies with the applicable type-volume limitations. Exclusive of the portions exempted by Rule 32(a)(7)(b)(iii), this brief contains 11,832 words. This certificate was prepared in reliance on the word-count function of the word processing system (Microsoft Word 2010) used to prepare the text of this brief. The undersigned further certifies that the brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 30(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point, Times New Roman font.

/s/ William A. Coates
William A. Coates

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 17, 2013, I caused the foregoing Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all participants in the case who are registered as CM/ECF users:


/s/ William A. Coates
William A. Coates